UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

CLIFFORD JAMES FROST, JR.,

    Plaintiff,

v.

DANA NESSEL,
in her official capacity as Attorney
General of the State of Michigan,

    Defendant.

Case No. 23-cv-1226

Hon.

_____

**PLAINTIFF'S COMPLAINT UNDER 42 U.S.C. § 1983 TO
ENJOIN STATE COURT CRIMINAL PROCEEDINGS**

Plaintiff Clifford James Frost, Jr. ("Plaintiff" or "Frost"), by his attorneys, Kickham Hanley PLLC and KDK Law, states the following for his Complaint Under 42 U.S.C. Section 1983 To Enjoin State Court Criminal Proceedings against the Defendant Dana Nessel, in her official capacity as Attorney General of the State of Michigan ("Defendant" or the "AG"):

## INTRODUCTION

1.    In a democratic republic like the United States, a criminal prosecutor has awesome powers. A single prosecutor has the authority to subject an accused to a process that ultimately can deprive the accused of their liberty.

2.    To deter the abuse of these powers, prosecutors are subject to rules aimed at ensuring that innocent people not only do not get convicted of crimes they did not

commit, but that innocent people are not even subject to criminal prosecutions. That means that a prosecutor's desire to convict an accused must yield to a prosecutor's obligation to "do justice." *See, e.g., People v. Morgan*, 86 Mich. App. 226, 272 N.W.2d 249 (1978) (quoting *People v. Brocato*, 17 Mich. App. 277, 169 N.W.2d 483 (1969)) (observing that the justice system "places upon the prosecutor not the duty to gain a conviction, but the obligation to do justice," and that "it is as much his [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."). Indeed, a citizen "may not be harassed or destroyed by prosecutions founded only upon private malice or popular fury." *Hurtado v. California*, 110 U.S. 516, 521; 4 S. Ct. 111 (1884). Plaintiff has brought this extraordinary action because the AG unfortunately is not seeking "justice," but instead has brought 8 serious felony charges against Plaintiff (which could effectively result in a lifetime prison sentence) even though she knows Plaintiff committed no crime. As a result, Plaintiff seeks this Court's intervention to protect his rights under the U.S. Constitution.

3. This action seeks to enjoin an ongoing Michigan state prosecution (the "Michigan Criminal Prosecution") instituted by the AG against Plaintiff and 15 other Michigan citizens (the "Republican Electors") who questioned the results of the 2020 presidential election in Michigan. The AG brought the Michigan Criminal Prosecution with no reasonable expectation of obtaining valid convictions against the Republican Electors in order to retaliate against and/or punish the Republican Electors – all of

whom are political opponents of the AG – for their unsuccessful efforts to protest the outcome of that election.

4.     In the State of Michigan, the AG – the prosecutor with the broadest powers – is an elected official and a member of a political party.

5.     The Michigan Criminal Prosecution represents an attempt to criminalize what was at most a futile political protest.  Pursuant to federal and state law, Michigan's 16 electoral votes for president are cast by "electors" of the political party whose candidates receive the highest number of votes in the State in the presidential election. After the 2020 presidential election, the State of Michigan (through Governor Gretchen Whitmer), after determining that Joe Biden and Kamala Harris received the highest number of votes in the State, certified the electors designated by the Democratic Party (the "Democrat Electors") as the electors who would cast Michigan's 16 electoral votes.

6.     Reduced to its essentials, the Michigan Criminal Prosecution is based solely upon a document (the "Republican Elector Certificate", Exhibit A hereto) purportedly signed by the 16 Republican Electors, including Plaintiff.  The AG alleges that "[n]otwithstanding the fact that the Democratic Party nominees had been certified by the Michigan Board of Canvassers as having received the greatest number of votes for President and Vice-President, the 16 persons who signed the [Republican Elector Certificate] falsely asserted that they were the duly elected and qualified Electors from the State of Michigan."  *See* Affidavit of Probable Cause, Exhibit B hereto, p. 19.  The AG alleges that the Republican Elector Certificate was submitted to Congress and the

National Archives but concedes that Congress only accepted the electoral votes submitted by the Democrat Electors that were certified by the State.  Nonetheless, based upon the Republican Elector Certificate, the AG has brought 8 felony counts, all of which require a showing that the Republican Elector Certificate was a "forgery," and which seek to imprison Plaintiff and the other Republican Electors for up to 14 years. *See* Indictment, Exhibit C hereto.

7.     The AG has a big problem, however.  The factual allegations of forgery which form the basis for all the counts in the Michigan Criminal Prosecution, even if true, as a matter of law do not constitute a crime for at least two reasons.  First, the crime of forgery requires an act that makes an instrument appear to be what it is not (*see, e.g., People v. Susalla*, 392 Mich. 387, 220 N.W.2d 405 (1974)), but the Republican Electors' Certificate was **exactly** what it purported to be.  Second, forgery cannot occur unless the act of forgery exposes another to loss, and there is no question that the actions the AG alleges were undertaken by Plaintiff and the other Republican Electors as a matter of law could not have resulted in Michigan's 16 electoral votes being awarded to the Republican Party's candidates and therefore could not have exposed **anyone** to a "loss."  *See* discussion, *infra*, of *In re Loyd*, 424 Mich. 514, 526, 384 N.W.2d 9 (1986).

8.     As will be discussed in great detail below, the Michigan and Federal election statutes which applied to the 2020 Presidential election collectively demonstrate that because Governor Whitmer formally certified the Democrat Electors as the duly elected Michigan electors, that certification was deemed "conclusive" under

federal law and had to be followed by Congress when it counted the electoral votes from the State of Michigan.  Not surprisingly, then, Congress counted only the electoral votes submitted by the Democrat Electors.  Thus, the Republican Elector Certificate at most had the effect of furthering a political protest and could never have resulted in Michigan's 16 electoral votes being cast for the Republican Party candidates.

9.      Notably, the AG herself has made public statements and filed pleadings in other cases acknowledging that the Elector Certificate was a legal nullity.  In one brief filed in the United States Court of Appeals for the Sixth Circuit, the AG cited a December 15, 2020 newspaper article titled "**Michigan Republicans who cast electoral votes for Trump have no chance of changing Electoral College result**." Nonetheless, the AG has claimed that the Elector Certification was "part of a much bigger conspiracy" to "overthrow the U.S. Government."  *See* MLive Article 12/15/20, Exhibit D hereto.   On a nationally televised television program prior to filing the charges, the AG called the conduct of the Republican Electors a "conspiracy to overthrow the United States Government" and constituted "the most significant case of election fraud ever in our state's history."  *See* Transcript of MSNBC's Rachel Maddow Show on January 13, 2022, Exhibit E hereto, p. 5.[1]

---

[1]      Viewable    at    https://www.msnbc.com/rachel-maddow/watch/michigan-attorney-general-refers-probe-of-fake-electors-to-federal-prosecutors-130841669808

10.    Fortunately, however, **"[t]here is a constitutional right to be free of bad faith prosecution."** *Hand v. Gary*, 838 F.2d 1420, 1424 (5th Cir. 1988) (emphasis added).   That right exists under the Fourteenth Amendment.   *See, e.g., Id.* at 1424 n.3.  Such prosecutions "cause sufficient irreparable harm to support federal injunction of a state prosecution." *Id.*  The Supreme Court has defined a bad-faith prosecution to include one that **"has been brought without a reasonable expectation of obtaining a valid conviction**." *Kugler v. Helfant*, 421 U.S. 117, 126 (1975) (emphasis added) (citing *Perez v. Ledesma*, 401 U.S. 82, 85 (1975)).  While federal court intervention in a state criminal proceeding is only permissible in "exceptional circumstances," *Kugler*, 421 U.S. at 123, this case amply meets that standard.

11.    For the reasons that will be detailed in full below, the Court should preliminarily and permanently enjoin the Michigan Criminal Prosecution because, among other things, it has been brought without a reasonable expectation of obtaining a valid conviction and therefore satisfies the bad faith requirement.

### JURISDICTION AND VENUE

12.    Plaintiff is a citizen of the State of Michigan and is one of the Defendants in the Michigan Criminal Prosecution.  He is the Defendant in Case No. 2023-23-02212-FY currently pending in Michigan's 54-1 District Court, which is in this Federal Judicial District.

13.    Defendant AG is the Attorney General of the State of Michigan with offices in this District.

14.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because this Court has original subject matter jurisdiction over all civil actions arising under the U.S. Constitution and Plaintiff's claims include a claim arising under the 4th and 5th Amendments of the U.S. Constitution, which apply to the States under the 14th Amendment to the U.S. Constitution.  Plaintiff is entitled to enforce these rights through a civil action under 42 U.S.C. § 1983.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the AG is located in this District, and under 28 U.S.C. § 1391(b)(2) because the underlying Michigan Criminal Prosecution is pending in this District and the actions which gave rise to Plaintiff's causes of action occurred in this District.

**FACTUAL BACKGROUND**

**A.      The Alleged Basis for the State Prosecution**

16.     The purported factual basis for the Michigan Criminal Prosecution is set forth in the Affidavit of Special Agent Investigatory Howard Shock ("Shock"), which is attached hereto as Exhibit B.  Shock describes how he "was assigned to investigate a possible violation of state felony criminal statutes relating to the forgery of a 'Certificate of Votes concerning the electors for President and Vice-President of the United States,' in violation of MCL 750.248 and MCL 168.933a . . ."  Exhibit B, ¶ 3.  Shock briefly describes the content of MCL 750.248 ("Making, altering, forging, or counterfeiting public record"), MCL 168.933a (Forgery), and MCL 750.249 (Uttering and Publishing).

Exhibit B, ¶¶ 4-6. He then describes the content of MCL 750.157a (Conspiracy). *Id.*, ¶ 7.

17.     Shock then alleges that "[o]ver the course of the investigation, it was discovered that a fraudulent 'Certificate of Votes of the 2020 Electors from Michigan' was created; that none of the sixteen signatories to this document were lawfully selected electors for the offices of President and Vice-President; and that the document was made and published with the intent to defraud the National Archives, President of the U.S. Senate, and others." *Id.*, ¶ 8. Shock states that "[i]n anticipation of the 2020 General Election, the two major political parties in Michigan met in their respective conventions and selected the persons who would serve as candidates for the electors of President and Vice-President of the United States." *Id.*, ¶ 10. Plaintiff Clifford Frost, Jr. was one of the electors the Republican Party selected. *Id.*

18.     Shock states that on November 23, 2020, after the presidential election, the Michigan Board of State Canvassers met and certified the election results, certifying that the Democratic candidates had received the greatest number of votes. *Id.*, ¶ 13. Governor Whitmer then "signed and issued an 'Amended Certificate of Ascertainment of the Electors of the President and Vice President of the United States'" identifying the Democratic candidates as the winners and stating that the Democratic electors "were duly elected as Electors." *Id.* Shock states that in light of the Governor's certification, "[t]he Republican nominees were not the duly elected Presidential electors and had no legal authority to act as duly elected Presidential electors." *Id.*

19.     Shock then alleges that the Republican electors, including Frost, signed a document titled "Certificate of the Votes of the 2020 Electors from Michigan" in which they "falsely asserted that they were the duly elected and qualified Electors" and that the Republican candidates, Trump and Pence, had won the election. *Id.*, ¶¶ 18-19. Shock alleges that someone – he does not say who – sent the Republican "Certificate of the Votes" to the National Archives and Records Administration by registered mail. *Id.*, ¶ 21. Shock alleges that another copy of the same "Certificate of the Votes" appeared in the United States Senate Archives. *Id.*, ¶ 24. Shock does not state how that copy came to be in the Senate Archives, other than reciting that "[t]he document also indicates on its face that it was sent by registered mail to the President of the United States Senate and the Archivist of the United States . . ." *Id.* Shock states that the mailing envelopes in the possession of the National Archives and the Senate Archives "were mailed from the East Lansing, Michigan Post Office" and bore "Kathleen Berden's name, address, and title" on the face of the envelopes next to the word "From." *Id.*, ¶ 25.

20.     On the basis of the above, Shock's affidavit alleges various felony counts of Forgery, Uttering and Publishing, Election Law – Forgery, and Conspiracy with respect to the underlying offenses. *Id.*, ¶¶ 38-45.

21.     However, **assuming all facts the AG alleged (through Shock) to support the Michigan Criminal Prosecution are true**, Frost did not commit a crime as a matter of law.

22.     Because no crime was committed, Frost has the right under the Fourteenth Amendment to be free from prosecution – not starting after his preliminary examination, or at any later date, but **NOW**, before he is forced to endure a preliminary examination related to activities that as a matter of law could not have constituted a crime.

23.     For the reasons discussed below, an examination of the applicable Michigan and Federal election statutes, and the application of the Michigan criminal statutes which form the basis for the Michigan Criminal Prosecution, confirm that no crime was committed here, even if all of the AG's factual allegations are true.  This is primarily because (1) forgery requires an act that makes an instrument appear to be what it is not, but the Republican Electors' Certificate was **exactly** what it purported to be, and (2) forgery cannot occur unless the act of forgery exposes another to loss, and the actions the AG alleges Plaintiff and the other Republican Electors undertook could not, as a matter of law, have resulted in Michigan's 16 electoral votes being awarded to the Republican Party's candidates, and therefore could not have exposed **anyone** to a loss.

### B.     The Michigan Election Statutes at Issue

24.     The Michigan Criminal Prosecution is based upon the alleged attempt by Plaintiff and the other Republican Electors to circumvent the process of certifying the electors who would cast their electoral votes for President and Vice-President by submitting the Republican Elector Certificate.  The procedure by which Michigan selects Presidential electors is set out in Chapter IV of the Michigan Election Law (MCL

168.41 – MCL 168.47).  The following Michigan statutory provisions govern that process:

25.   First, MCL 168.42 requires that, prior to a presidential election, each political party must elect a slate of electors who would be entitled to cast the State's 16 electoral votes in the event that their party's chosen candidates for President and Vice President received the most votes in the Presidential election.  That statute provides:

**168.42 Presidential electors; selection at state political party conventions, certification.**

Sec. 42.

In the year in which presidential electors are to be elected under section 43, each political party in this state shall choose at its fall state convention a number of candidates for electors of president and vice-president of the United States equal to the number of senators and representatives in congress that this state is entitled to elect. The chairperson and the secretary of the state central committee of each political party shall, within 1 business day after the conclusion of the state convention, forward by registered or certified mail a certificate containing the names of the candidates for electors to the secretary of state. The candidates for electors of president and vice-president who shall be considered elected are those whose names have been certified to the secretary of state by that political party receiving the greatest number of votes for those offices at the next November election.

26.   Second, MCL 168.45 makes clear that Michigan voters in a presidential election do not directly vote for individual candidates but instead vote for the presidential electors chosen by the political party of the individual candidate:

**168.45 Cross or check mark as vote for presidential electors.**

Sec. 45.

Marking a cross (X) or a check mark ( ) in the circle under the party name of a political party, at the general November election in a presidential year, shall not be considered and taken as a direct vote for the candidates of that political party for president and vice-president or either of them, but, as to the presidential vote, as a vote for the entire list or set of presidential electors chosen by that political party and certified to the secretary of state pursuant to this chapter.

27.     Third, MCL 168.46 authorizes the Michigan Board of Canvassers to determine the Presidential and Vice-Presidential candidates who receive the highest number of votes in the election, and further **requires** the Governor of the State of Michigan to **certify** the legal electors elected by the political party based upon the Board of Canvassers determinations:

> **168.46 Presidential electors; determination by board of state canvassers; certificate of election.**
>
> Sec. 46.
>
> As soon as practicable after the state board of canvassers has, by the official canvass, ascertained the result of an election as to electors of president and vice-president of the United States, the **governor shall certify, under the seal of the state**, to the United States secretary of state, the names and addresses of the electors of this state chosen as electors of president and vice-president of the United States. The governor shall also transmit to each elector chosen as an elector for president and vice-president of the United States a certificate, in triplicate, under the seal of the state, of his or her election. [emphasis added]

28.     Importantly, only the electors certified by the Governor have the legal ability to cast the State's electoral votes for President and Vice-President.  This is made clear by MCL 168.47, which provides:

> **168.47 Convening of presidential electors; time and place thereof; resignations; refusal or failure to vote; vacancies.**

Sec. 47.

The electors of president and vice-president shall convene in the senate chamber at the capitol of the state at 2 p.m., eastern standard time, on the first Monday after the second Wednesday in December following their election. At any time before receipt of the certificate of the governor or within 48 hours thereafter, an elector may resign by submitting his written and verified resignation to the governor. Failure to so resign signifies consent to serve and to cast his vote for the candidates for president and vice-president appearing on the Michigan ballot of the political party which nominated him. Refusal or failure to vote for the candidates for president and vice-president appearing on the Michigan ballot of the political party which nominated the elector constitutes a resignation from the office of elector, his vote shall not be recorded and the remaining electors shall forthwith fill the vacancy. The ballot used by the elector shall bear the name of the elector. If at the time of convening there is any vacancy caused by death, resignation, refusal or failure to vote, neglect to attend, or ineligibility of any person elected, or for any other cause, the qualified electors of president and vice-president shall proceed to fill such vacancy by ballot, by a plurality of votes. When all the electors appear and the vacancy shall be filled, they shall proceed to perform the duties of such electors, as required by the constitution and laws of the United States. If congress hereafter fixes a different day for such meeting, the electors shall meet and give their votes on the day designated by act of congress.

29.    Importantly, the AG concedes that all of the above-statutorily required procedures and actions actually occurred in the aftermath of the November 2020 Presidential election.  First, the Democrat Party and the Republican Party each elected 16 electors who would be entitled to cast their votes for President and Vice-President in the event that their candidates prevailed in the election.  Shock Affidavit, Exhibit B hereto, ¶ 11.  Indeed, the AG concedes that the Republican Electors being prosecuted were properly installed at the Republican Party's convention, per MCL 168.42.

30.    Second, the Board of Canvassers determined – and certified to Governor Whitmer on November 23, 2020 – that Joe Biden and Kamala Harris of the Democratic Party had won the most votes in the November 2020 election.  *See* Shock Affid., ¶ 13; Governor's Press Release, Exhibit F hereto (announcing the certification by the Board of Canvassers).

31.    Third, on November 23, 2020, Governor Whitmer signed a "Certificate of Ascertainment of the Electors of the President and Vice President of the United States of America" (the "Governor's Certificate", Exhibit G hereto) which, pursuant to MCL 168.46, certified that 16 named persons "nominated by the Democratic Party" (i.e., the Democrat Electors) were "duly elected as Electors of the President and Vice President of the United States of America."  The official seal of the State of Michigan was affixed to the Governor's Certificate.  *See* Exhibit G.

32.    Fourth, the Democrat Electors cast their votes for Joe Biden and Kamala Harris and "certificates of votes were transmitted to the President of the Senate, the Archivist of the United States, the Secretary of State of Michigan and the Chief Judge of the US District Court for the Western District of Michigan."  Shock Affidavit, Exhibit B hereto, ¶ 16.

C.      **The Applicable Federal Election Statutes[2]**

33.      The State of Michigan's admitted adherence to its own statutory procedures for certifying electors ensured that **only** the Democratic Electors could legally cast Michigan's electoral votes for President and Vice-President after the 2020 election regardless of any legal or illegal actions taken by the Republican Electors.  This is because, under federal law, Governor Whitmer's certification of the Democrat Electors under Michigan law was "conclusive" and had to be followed by Congress.  In this regard, 3 U.S.C. § 5 (Exhibit H hereto), provided:

§ 5. Determination of controversy as to appointment of electors

If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, **shall be conclusive**, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned." [emphasis added].

34.      "Both the Constitution of the United States and 3 U.S.C. § 5 indicate that states have the primary authority to determine the manner of appointing Presidential

---

[2]      The federal statutes referenced in this section were substantially revised in 2022. The versions of those provisions referenced here are the ones that were in effect in during the relevant time period – *i.e.,* November 2020 through January 2021.  **Plaintiff has attached a copy of each statute section with the prior version highlighted in yellow.**  *See, e.g.,* 3 U.S.C. § 5, Exhibit H hereto, p. 3 (highlighted text of prior version).

Electors and to resolve most controversies concerning the appointment of Electors." *Touchston v. McDermott*, 234 F.3d 1130 (11th Cir. 2000).  Indeed, in *Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70, 77; 121 S. Ct. 471 (2000), the Supreme Court observed that Section 5 "creates a **'safe harbor' for a State insofar as congressional consideration of its electoral votes is concerned.**  If the state legislature has provided for final determination of contests or controversies by a law made prior to election day, that determination shall be **conclusive** if made at least six days prior to said time of meeting of the electors." [Emphasis added].  *See also Id.* at 78 (observing that Section 5 "contains a principle of federal law that would assure **finality of the State's determination** if made pursuant to a state law in effect before the election.") (emphasis added).

35.    Here, the AG concedes that the State of Michigan certified the Democratic Electors pursuant to a state law in effect before the election within the times set forth in Section 5.  Accordingly, the certification of the Democratic Electors was conclusive under federal law and Congress was required to give full legal effect to the electoral votes cast by Democratic Electors.  In other words, Congress was precluded as a matter of law from even considering any alternative submission of electoral votes from any other sources, including the Republican Party Electors.

36.    This is further confirmed by 3 U.S.C. § 6 (Exhibit I hereto), which also make clear that the competing Elector Certification purportedly submitted by Plaintiff

and the other Republican Electors could not have been given any effect because it was

contradicted by the Governor's Certificate.  That section provides:

> § 6. Credentials of electors; transmission to Archivist of the United States and to Congress; public inspection
>
> "**It shall be the duty of the executive of each State, as soon as practicable after the conclusion of the appointment of the electors in such State by the final ascertainment, under and in pursuance of the laws of such State providing for such ascertainment, to communicate by registered mail under the seal of the State to the Archivist of the United States a certificate of such ascertainment of the electors appointed, setting forth the names of such electors and the canvas or other ascertainment under the laws of such State of the number of votes given or cast for each person for whose appointment any and all votes have been given or cast;** and it shall also thereupon be the duty of the executive of each State to deliver to the electors of such State, on or before the day on which they are required by section 7 of this title to meet, six duplicate-originals of the same certificate under the seal of the State; **and if there shall have been any final determination in a State in the manner provided for by law of a controversy or contest concerning the appointment of all or any of the electors of such State, it shall be the duty of the executive of such State, as soon as practicable after such determination, to communicate under the seal of the State to the Archivist of the United States a certificate of such determination in form and manner as the same shall have been made**; and the certificate or certificates so received by the Archivist of the United States shall be preserved by him for one year and shall be a part of the public records of his office and shall be open to public inspection; and the Archivist of the United States at the first meeting of Congress thereafter shall transmit to the two Houses of Congress copies in full of each and every such certificate so received at the National Archives and Records Administration." [emphasis added]

37.     Because the State of Michigan complied with its own statutes in certifying

the Democratic Electors, Congress was required to count the votes submitted by the

Democratic Electors, and only the Democratic Electors.  This is made clear by 3 U.S.C.

Sec. 15 (Exhibit J hereto), which provides:

§ 15. Counting electoral votes in Congress

"Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer. Two tellers shall be previously appointed on the part of the Senate and two on the part of the House of Representatives, to whom shall be handed, as they are opened by the President of the Senate, all the certificates and papers purporting to be certificates of the electoral votes, which certificates and papers shall be opened, presented, and acted upon in the alphabetical order of the States, beginning with the letter A; and said tellers, having then read the same in the presence and hearing of the two Houses, shall make a list of the votes as they shall appear from the said certificates; and the votes having been ascertained and counted according to the rules in this subchapter provided, the result of the same shall be delivered to the President of the Senate, who shall thereupon announce the state of the vote, which announcement shall be deemed a sufficient declaration of the persons, if any, elected President and Vice President of the United States, and, together with a list of the votes, be entered on the Journals of the two Houses. Upon such reading of any such certificate or paper, the President of the Senate shall call for objections, if any. Every objection shall be made in writing, and shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives before the same shall be received. When all objections so made to any vote or paper from a State shall have been received and read, the Senate shall thereupon withdraw, and such objections shall be submitted to the Senate for its decision; and the Speaker of the House of Representatives shall, in like manner, submit such objections to the House of Representatives for its decision; and **no electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section 6 of this title from which but one return has been received shall be rejected**, but the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified.  **If more than one return or paper purporting to**

**be a return from a State shall have been received by the President of the Senate, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed**, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law; **and in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted**. When the two Houses have voted, they shall immediately again meet, and the presiding officer shall then announce the decision of the questions submitted. No votes or papers from any other State shall be acted upon until the objections previously made to the votes or papers from any State shall have been finally disposed of. [Emphasis added]

38.     Thus, in Section 15, Congress expressly envisioned two potential scenarios and dictated how Congress was required to address each one.  First, Section 15 addressed the situation where only "one return was received" from a State.  Under those circumstances, Congress could not reject the electoral votes so long as they had "**been regularly given by electors whose appointment has been lawfully certified**

to according to section 6 of this title."  Clearly, the Governor's certification here satisfied 3 U.S.C. § 6, and the votes purportedly cast by the Democrat Electors were in fact cast by the Democrat Electors.  Accordingly, Congress was legally required to count Michigan's electoral votes as cast by the Democrat Electors.

39.    The same is true for the other possibility.   Elsewhere in Section 15, Congress considered the possibility that competing slates of electors could submit electoral votes for the same state.   Under those circumstances, Congress expressly required that Congress consider only the votes "given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed." There is no question that the only electors determined by section 5 to have been appointed were the Democratic Electors.

40.    But to make this conclusion even more inevitable, Section 15 goes on to provide that the Governor's certification, by virtue of 3 U.S.C. § 6 would have been dispositive, even if the State of Michigan had not reached a "determination" as defined by 3 U.S.C. § 5.  This is because Section 15 provides that "**in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State.**

**But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted**." Again, Governor Whitmer's certification ensured that, even if the Republican Elector Certificate had reached the floor of Congress, the applicable state and federal statutes collectively prohibited Congress from counting the votes of the Republican Electors.

41.    Not surprisingly, then, the Congressional Record confirms that Congress received the Michigan electoral votes submitted by the Democrat Electors without even mentioning the Republican Elector Certificate:

> The VICE PRESIDENT. Hearing none, **this certificate from Michigan, the Parliamentarians have advised me, is the only certificate of vote from that State that purports to be a return from the State and that has annexed to it a certificate from an authority of the State purporting to appoint and ascertain electors**.
>
> Senator KLOBUCHAR. Mr. President, the certificate of the electoral vote of the State of Michigan seems to be regular in form and authentic, and it appears therefrom that Joseph R. Biden, Jr., of the State of Delaware received 16 votes for President and KAMALA D. HARRIS of the State of California received 16 votes for Vice President. [167 Cong. Rec. H96, 2021, Exhibit K hereto (emphasis added)]

**D.    The Michigan Criminal Statutes Which Form the Basis for the Indictment**

42.    Despite all of the foregoing, the AG has brought charges against Plaintiff under four Michigan criminal statutes.  First, MCL 750.248 (Making, altering, forging, or counterfeiting public record) provides:

(1) A person who falsely makes, alters, forges, or counterfeits a public record, or a certificate, return, or attestation of a clerk of a court, register of deeds, notary public, township clerk, or any other public officer, in relation to a matter in which the certificate, return, or attestation may be received as legal proof, or a charter, will, testament, bond, writing obligatory, letter of attorney, policy of insurance, bill of lading, bill of exchange, promissory note, or an order, acquittance of discharge for money or other property, or a waiver, release, claim or demand, or an acceptance of a bill of exchange, or indorsement, or assignment of a bill of exchange or promissory note for the payment of money, or an accountable receipt for money, goods, or other property with intent to injure or defraud another person is guilty of a felony punishable by imprisonment for not more than 14 years.

43.  Second, MCL 750.249 (Uttering and Publishing) provides:

(1) A person who utters and publishes as true a false, forged, altered, or counterfeit record, instrument, or other writing listed in section 248 knowing it to be false, altered, forged, or counterfeit with intent to injure or defraud is guilty of a felony punishable by imprisonment for not more than 14 years.

44.  Third, MCL 168.933a (Forgery) provides:

Except as otherwise provided in this act, a person who does either of the following for any purpose under this act is guilty of forgery:

  (a) Knowingly makes, files, or otherwise publishes a false document with the intent to defraud.

  (b) Knowingly makes, files, or otherwise publishes a document that contains false signatures with the intent to defraud.

45.  Fourth, MCL 750.157a (Conspiracy) provides:

Any person who conspires together with 1 or more persons to commit an offense prohibited by law, or to commit a legal act in an illegal manner is guilty of the crime of conspiracy punishable as provided herein:

  (a) Except as provided in paragraphs (b), (c) and (d) if commission of the offense prohibited by law is punishable by imprisonment for 1 year or more, the person convicted under this section shall be punished by

- 22 -

a penalty equal to that which could be imposed if he had been convicted of committing the crime he conspired to commit and in the discretion of the court an additional penalty of a fine of $10,000.00 may be imposed.

\* \* \*

(d) Any person convicted of conspiring to commit a legal act in an illegal manner shall be punished by imprisonment in the state prison for not more than 5 years or by a fine of not more than $10,000.00, or both such fine and imprisonment in the discretion of the court.

### E.   The Electors' Certificate Could Not Be a Forgery Because the Certificate Did Not Purport to Be Something It Was Not.

46.     All the counts of the criminal complaint require a showing that the defendants in the Michigan Criminal Prosecution have committed the crime of forgery.[3]

47.     The Michigan Supreme Court has defined forgery as the making of a document with intent to deceive in a manner which exposes another to loss.  *In re Loyd*, 424 Mich. 514, 526, 384 N.W.2d 9 (1986).   In *People v. Susalla*, 392 Mich. 387, 220 N.W.2d 405 (1974), the Court reaffirmed its assertion set forth in *In re Stout*, 371 Mich. 438, 441, 124 N.W.2d 277 (1963) that forgery includes any act which fraudulently makes an instrument purport to be what it is not.  *Susalla*, 392 Mich. at 390.  *See also People v. Hodgins*, 85 Mich. App. 62, 65, 270 N.W.2d 527 (1978).   The *Susalla* Court also

---

[3]     MCL 750.248 and MCL 168.933a expressly criminalize forgery.  The elements of uttering and publishing statute, MCL 750.249, are (1) knowledge on the part of the defendant that the instrument was false; (2) an intent to defraud, and (3) **either** a presentation of the forged instrument for payment **or**  presentation of a forged "record," "public record," or other document specified in MCL 750.248 in a manner "capable of affecting the rights of others or creating liability in others."  *People v. Cassadine*, 258 Mich. App. 395, 3990400, 671 N.W.2d 559 (2003).

concluded that the key to forgery appeared to be that the writing itself was a lie. *Susalla,* 392 Mich. at 392-393.

48.     Here, given the AG's allegations, the Electors' Certificate can only be characterized as being exactly what it purports to be: it accurately identifies the persons **purporting to be** the "duly elected and qualified Electors for President and Vice President of the United States of America from the State of Michigan."  In sum, the "writing itself" is "not a lie."

49.     At most, the AG alleges that the Elector's Certificate contains false statements of fact.  But the Michigan courts have made clear that an authentic document that contains false statements as a matter of law is not a "forgery."  For example, in *People v. Thomas*, 182 Mich. App. 225; 452 N.W.2d 215 (1989), a police officer was charged with forgery for including false information in a police report.  The Court of Appeals held that there was no forgery because the police report was exactly what it purported to be, notwithstanding the allegedly false information.  The Court observed:

> In the instant case, it can be argued that defendant included the false information with the intent to deceive and that such action resulted in exposing the suspect to loss of his freedom.  **However, we are hard put to find that this single statement made the entire police report purport to be something it was not and decline any invitation to extend the definition of forgery to this context**.  [182 Mich. App. at p. 229-230 (emphasis added).

50.     Similarly, in *People v. Hardrick*, Nos. 333568, 333898; 2017 Mich. App. LEXIS 2087 (Dec. 19, 2017) (Exhibit L hereto), defendant recorded numerous quitclaim deeds on properties he did not actually own.  He then proceeded to attempt

to sell the properties to third parties.  He was charged with, among other crimes, forgery under MCL 750.248.  Defendant was convicted of perjury, but the Court of Appeals reversed, finding that the quit claim deeds were "exactly what they purported to be." In reaching this conclusion, the Court observed:

> **Here, the quit claim deeds, prepared by defendant, did not purport to be anything other than quitclaim deeds conveying whatever interest defendant had in the property to his company or vice versa**. A quitclaim deed is defined as "[a] deed that conveys the grantor's complete interest or claim in certain property but that neither warrants of professes that the title is valid." Black's Law Dictionary (10th Ed.).  Thus, the deeds only purported to convey whatever interest defendant or his company possessed, even if neither possessed any legal interest. Accordingly, the quitclaim deeds were not falsely made, and there was insufficient evidence to support defendant's convictions of forgery of a document affecting real property. [*Hardrick*, 2017 Mich. App. LEXIS 2087 at **9-10 (emphasis added).]

51.    Like the police report in *Thomas* and the quit claim deeds in *Hardrick*, under the facts alleged in the indictment, the Republican Electors' Certificate indisputably is authentic.  It identifies each person purporting to execute it and the indictment alleges that each of the Republican Electors actually signed the Certificate.  The fact that, in the government's view, the Republican Electors were not authorized to submit the Certificate and that they falsely represented that they **were** duly-authorized does not change the fact that the Certificate is "exactly what it purported to be."[4]

---

[4]    These facts clearly distinguish this case from, for example, *People v. Hawkins*, 340 Mich. App. 155; 985 N.W.2d 853 (2022).  There, defendant, an election worker, was charged with forgery based upon her alteration of an official election record to change

52.     The Elector's Certificate could be deemed to "purport to be what it is not" only if Plaintiff and the other Republican Electors tried to "dummy up" a certificate that appeared to comply with the state and federal requirements in order to evade the state and federal electoral requirements and fool Congress into giving Michigan's 16 electoral votes to the Republicans.  But that would require Plaintiff and the other Republican Electors to, at the very least, present an Electors' Certificate that didn't include their own signatures but instead contained the forged signatures of the Democratic Electors (presumably falsely voting for Donald Trump and Mike Pence) coupled with a forged copy of the necessary Governor's Certification.

53.     Here, however, there is no allegation that Plaintiff forged the signature of any of the Democratic Electors.  To the contrary, the Affidavit supporting the Michigan Criminal Prosecution specifically asserts that the Elector Certificate was "signed by all 16" Republican Electors.  Exhibit B, ¶¶ 18-19.  Remarkably, the Affidavit states that a Michigan State Police Forensic Scientist confirmed that the signature of Plaintiff and certain other Republican Electors on the Elector Certificate as a "match to their known signatures." *Id.*, ¶ 30.  Nor is there an allegation that Plaintiff forged the Governor's

---

the number of votes cast in an election.  The Court held that the forgery charge should go forward because "defendant's fraudulent act of falsifying the QVF made that altered election record appear to be what it certainly was not, an accurate report regarding the AV ballots."  Here, again, the Republican Electors' Certificate is exactly what it appears to be.

Certificate. Both of those types of forgery are necessary before the Elector Certificate could be characterized as something other than what it purports to be.

54. In sum, the submission of an authentic document which contains false statements of fact as a matter of law cannot constitute the crime of forgery. The AG does not contend that the Electors' Certificate is not what it purports to be. To the contrary, the AG specifically alleges that the signatures of the Republican Electors on the Electors' Certificate are genuine. The AG's allegations that the Republican Electors lied in that otherwise genuine document cannot as a matter of law establish that the Republican Electors' Certificate is a forgery.

### F. The Electors' Certificate Could Not Constitute a Crime Because as a Matter of Law It Could Never Have Achieved the Purported Goal of Overturning the Election

55. There is another important reason the Elector Certificate as a matter of law cannot serve as a basis for criminal liability for forgery: the Elector Certificate was a legal nullity and therefore never could have achieved the Republican Electors' purported goal of having Congress award Michigan's 16 electoral votes to Donald Trump and Mike Pence.

56. Again, forgery requires "the making of a document with intent to deceive **in a manner which exposes another to loss**." *In re Loyd*, 424 Mich. 514, 526, 384 N.W.2d 405 (1974) (emphasis added). *See also People v. Hodgins*, 85 Mich. App. 62, 65, 270 N.W.2d 527 (1978) (forgery requires a showing "that a liability is created in someone other than the defendant or some liability is enlarged.") Said another way,

forgery requires "the false making or material alteration, with intent to defraud, of any writing which, if genuine, **might apparently be of legal efficacy or the foundation of legal liability**." *People v. Susalla*, 392 Mich. 387, 392, 220 N.W.2d 405 (1974) (quoting 2 Wharton's Criminal Law & Procedure Sec. 621, p. 396) (emphasis added).

57.     The same is true under the uttering and publishing statute, MCL 750.249. That statute requires, among other things, **either** a presentation of the forged instrument for payment **or** presentation of a forged "record," "public record," or other document specified in MCL 750.248 in a manner "capable of affecting the rights of others or creating liability in others." *People v. Cassadine*, 258 Mich. App. 395, 3990400, 671 N.W.2d 559 (2003).

58.     In short, to be a crime, an alleged forgery must have at least potential legal consequences, either by benefiting the forger or harming the victim, or both.  Here, however, the allegedly forged Republican Electors' Certificate could not have been legally capable of working the allegedly intended fraud or injury because (1) it did not have Governor Whitmer's certification, (2) Governor Whitmer's certification named the Democrat Electors and not the electors named in the allegedly forged certification, and (3) the state and federal statutory scheme makes Whitmer's certification "conclusive" as to the identity of the electors.  Because the Electors' Certificate did not "expose" anyone to a "loss," there could be no forgery as a matter of law.

### THIS CASE AMPLY SATISFIES THE STANDARD TOR GRANTING A FEDERAL COURT INJUNCTION AGAINST A PENDING STATE COURT PROSECUTION

### A.     The Standards for Enjoining the State Court Prosecution

#### 1.     *The General Principles Which Apply to Federal Actions to Enjoin State Court Proceedings*

59.    Generally, federal courts should not interfere with ongoing proceedings in state courts. Indeed, Congress codified this notion with the Anti-Injunction Act: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. Sec. 2283. Lawsuits brought under 42 U.S.C. Sec. 1983 are excepted from the Anti-Injunction Act, however. *See Mitchum v. Foster*, 407 U.S. 225, 242-43 (1972) ("[W]e conclude that, under the criteria established in our previous decisions construing the anti-injunction statute, [42 U.S.C. Sec. 1983] is an Act of Congress that falls within the 'expressly authorized' exception of that law.").

60.    Nonetheless, state criminal defendants who seek vindication of their constitutional rights in federal court under Section 1983 must demonstrate that the court should not decline to hear the case based upon the so-called *Younger* abstention doctrine.

61.    Under the *Younger* abstention doctrine (named after the Supreme Court case of *Younger v. Harris*, 401 U.S. 37, 44 (1971)), federal district courts generally must decline to exercise jurisdiction when: "(1) the federal proceeding would interfere with an 'ongoing state judicial proceeding'; (2) the state has an important interest in

regulating the subject matter of the claim; and (3) the plaintiff has 'an adequate opportunity in the state proceedings to raise constitutional challenges.'" *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

### 2. <u>*Younger* Abstention Is Inapplicable Where The State Court Prosecution Is Brought In Bad Faith</u>

62.     A federal court may nonetheless enjoin a pending state-court criminal proceeding if one of three exceptions to *Younger* abstention applies.  "These exceptions include bad faith, harassment, or flagrant unconstitutionality of the statute or rule at issue." *Doe v. University of Kentucky*, 860 F.3d 365, 371 (6th Cir. 2017).

63.     *Younger* abstention is not required here because the State Court Prosecution was brought in bad faith and/or to harass Plaintiff.  Plaintiff can satisfy the "bad faith" requirement by showing that the state officials have proceeded "'without hope of obtaining a valid conviction.'" *Perez v. Ledesma*, 401 U.S. 82, 85; 91 S. Ct. 674 (1971).  *See also Kevorkian v. Thompson*, 947 F. Supp. 1152, 1164 (E.D. Mich. 1997) ("Bad faith generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction").

64.     A very recent decision, *Netflix, Inc. v. Babin*, 641 F. Supp. 3d 319 (E.D. Tex. 2022), supports the proposition that a federal court can find "bad faith" sufficient to enjoin a prosecution where a state prosecutor alleges facts which, even if proven, would not constitute a crime.

65.    In *Netflix*, the plaintiff complained that defendant Babin, a Texas district attorney, brought a bad faith prosecution essentially alleging that Netflix broadcast child pornography in a movie called *Cuties.  See Id.* at 326-28.

66.    Netflix argued, and the court agreed, that at least one of Babin's charges against Netflix was "brought without hope of obtaining a valid conviction" because the material at issue could not, as a matter of law, have constituted child pornography given that the actress in question was over 18 years old at the time the scene was filmed.  *Id.* at 335-38.

67.    The district court thus entered a preliminary injunction barring Babin from continuing his prosecution and ordered the parties to appear for trial.  *Id.* at 343. The *Netflix* case is pending on appeal in the Fifth Circuit.

**B.    The AG Is Not Immune from Plaintiff's Claims Under the Eleventh Amendment**

68.    The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

69.    Courts have long held that the Eleventh Amendment applies to suits by a citizen of a state against his or her own state.  *See Hans v. Louisiana*, 134 U.S. 1; 10 S. Ct. 504 (1890).

70.     However, the Eleventh Amendment does not apply to suits for injunctive relief.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104-05; 104 S. Ct. 900 (1984).  "However, the *Ex parte Young* doctrine allows federal jurisdiction over a suit against a state official in certain situations where that suit seeks only prospective injunctive relief in order to end a continuing violation of federal law." *Walker v. Livingston*, 381 Fed. Appx. 477, 478 (5th Cir. 2010) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73; 116 S. Ct. 1114; 134 L. Ed. 2d 252 (1996) (citing *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908))).

71.     "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261, 296; 117 S. Ct. 2028 (1997) (O'Connor, J., concurring in part and concurring in judgment).

72.     Thus, *Ex parte Young* allows Plaintiff's Section 1983 claims for prospective injunctive relief against the AG in her official capacity.

## C.     The AG Brought the State Court Prosecution Without a Reasonable Expectation of Obtaining a Valid Conviction

73.     The State Court Prosecution was brought in bad faith because the AG had and has no reasonable expectation of obtaining a valid conviction.  This conclusion is required because the conduct alleged, even if proven, does not constitute a crime as a matter of law.  Indeed, as discussed below, two other prosecutorial agencies investigated

the facts relating to the Republican Elector Certification and declined to bring criminal charges against any of the Republican Electors, and the AG herself has expressly acknowledged that Defendant's actions were not criminal.  As a result, the AG brought the State Court Prosecution without a reasonable expectation of obtaining a valid conviction, which actions empower this Court to enjoin the State Court Prosecution.

### 1.   The Justice Department and the Ingham County Prosecutor's Office Refused to Bring Criminal Charges Against Any of the Republican Electors

74.     Notably, the AG brought the State Court Prosecution only after federal and local prosecutors refused to bring criminal charges against any of the Republican Electors.

75.     In 2021, the Ingham County Prosecutor refused to bring charges against the Republican Electors because an Assistant Ingham County Prosecutor, after an extensive evaluation of the facts and governing law, concluded that the Republican Electors Certificate was a "political stunt" which "did not trick or fool anybody." Electoral College Fraud Prosecution Recommendation, Exhibit M hereto, pp. 7-8.  The Ingham County Prosecutor's office specifically rejected the AG's "opinion" that "when the sixteen Republican candidates for electors transmitted their certification of votes they violated MCL 750.248 and MCL 169.933a."  *Id.*, p. 2.

76.     Undaunted, in January 2022, the AG publicly announced that she had referred the investigation of the Republican Electors to the U.S. Justice Department via the U.S. Attorney for the Western District of Michigan.  At the time, the AG stated that

the federal referral was appropriate because "[s]eemingly there's a conspiracy that occurred between multiple states.  So if what your ultimate goal is, is not just to prosecute these 16 individuals, but to find out who put them up to this, is this part of a bigger conspiracy at play in order to undermine the legitimate results of the 2020 presidential election, not just in Michigan but nationally? … It creates jurisdictional issues."  David Boucher, *Nessel Reopens Criminal Probe of GOP 'Fake Electors' After No Word from Feds*, Detroit Free Press, January 6, 2023, Exhibit N hereto, p. 1 (quoting an AG statement from January 2022).  Despite the AG's referral, the Justice Department never brought criminal charges against any of the Republican Electors.

77.    When it became clear that neither the Ingham County Prosecutor nor the Justice Department would pursue the criminal charges she urged, the AG "reopened" the investigation of the Republican Electors in January 2023.  At that time, the AG expressed frustration with the Justice Department, stating during a news media call with the Democratic Attorneys General Association that "[q]uite candidly, yes, we are reopening our investigation, because I don't know what the federal government plans to do."  *Id.* (quoting the AG's statements to the DAGA on January 6, 2023).

### 2.    *The AG's Own Public Statements Confirm That the AG Knows That No Crime Was Committed*

78.    As described in detail above, the Elector Certificate had no potential to influence anything because Governor Whitmer's Certification issued and delivered to Congress on November 23, 2020 was deemed "conclusive" as to the identity of the

Michigan electors.  This Certification was made three weeks before the Republican Elector Certificate purportedly was executed and delivered by Plaintiff and the other Republican Electors.

79.    Remarkably, in a July 17, 2023 press conference the AG convened to announce the State Court Prosecution, the AG made public statements which confirm that the AG knows or should know that she has no reasonable expectation of a conviction because she effectively admits that the allegedly forged Elector Certificate could not have impacted the election result as a matter of law.  A transcript of the AG's statements at the press conference, which the AG's Office issued, is attached as Exhibit O hereto.

80.    For example, the AG stated: "This plan – to reject the will of the voters and undermine democracy – was fraudulent and **legally baseless**."  Exhibit O at p. 2 (emphasis added).  The AG further stated that once the election results had been "officially certified," "**[t]here was no legitimate legal avenue nor <u>any plausible use of such a document</u> or an alternative slate of electors**."  *Id.* at p. 5 (emphasis added).  At that point, in the AG's view, **"[t]here remained no question of the outcome of this election."**  *Id.* at p. 6 (emphasis added).  In the AG's estimation, therefore, by the time the Republican Elector Certificate was purportedly executed on December 14, 2020, the Republican Elector Certificate could not have influenced the outcome of the 2020 presidential election.

81.     An allegedly forged document is not criminal unless it **has** a plausible use – *i.e.*, the potential to dupe someone.  If, as the AG effectively concedes, there was no plausible use of the allegedly forged document, its necessarily means that the AG concedes that the allegedly forged document could not have duped anyone, much less altered the outcome of the election.

82.     In sum, the AG essentially admits that the alleged forgery could never have succeeded and therefore as a matter of law could not have "exposed another to loss."

83.     More recently, on September 18, 2023, the AG publicly admitted that it will be **impossible** to prove the requisite intent to convict Plaintiff under the Michigan statutes he allegedly violated, because Plaintiff and the other state court defendants "genuinely believe[d]" that their actions were lawful.  *See* CNN Article 9/22/23, Exhibit P hereto; Transcript of CNN Segment 9/22/23, Exhibit Q hereto.[5]

84.     In a public Zoom call on September 18, 2023, the AG stated as follows:

> DANA NESSEL:  People talk a lot about (inaudible) flipping some of those people so that they can become witnesses against the remaining defendants, the worst-acting defendants. **The problem is, these are people who have been brainwashed,** and when I say brainwashed, how do you flip someone who concedes that they did everything that they're accused of doing but what they say is, **we believe that we were in the right. We think that Donald Trump is the real winner of the election. They legit believe that, they genuinely believe it. So how do you -- somebody can't even plead guilty if they wanted to because they**

---

[5]     Viewable at   https://www.cnn.com/2023/09/22/politics/dana-nessel-fake-electors-michigan-comments/index.html

**can't admit that what they did violated the law because they still think they're right.**  [Transcript of Zoom call contained within CNN Segment, Exhibit Q hereto, p. 1 (emphasis added).]

85.     During the same Zoom call, the AG also made statements suggesting that

the Michigan Criminal Prosecution is politically motivated:

> Ingham County, where Lansing is located, is a very, very Democratic leaning county, but I worry that there will be people who just won't care that they clearly violated the law because they believe that the ends justify the means and that, you know, it's okay to do as long as the endgame is getting this autocrat into office, who will surely be the end of Democracy in this nation.  [*Id.*, pp. 1-2]

In other words, Ingham County – where the Michigan Criminal Prosecution is pending

– contains a great many politically reliable "Democratic leaning" jurors.  Why would

the State of Michigan's chief law enforcement officer – tasked with the blind

administration of justice – crow about the prosecutorial advantages (born of political

prejudices) of the forum she selected to prosecute Michigan citizens?

86.     Additional statements the AG made during the same Zoom call, which

the Detroit News quoted, made the AG's political motivation even more clear:

> "We charged eight defendants. We convicted five," Nessel said of her office's prosecution of the plot to kidnap Whitmer. "But **three of them were acquitted by a jury in Antrim County, not because we didn't have great evidence but because essentially, it seemed to me as though the Antrim County jurors, (in a) very, very right-leaning county (were) seemingly not so concerned about the kidnapping and assassination of the governor.**"
>
> * * *
>
> Antrim County is a GOP-leaning area with Trump, a Republican, winning 61% of the votes there in November 2020.

In her remarks on Monday, Nessel compared Antrim County to Ingham County, where her office brought felony charges against 16 Republicans who signed a false certificate after the 2020 presidential election in an attempt to challenge Democrat Joe Biden's victory.

**"Eventually, those cases will be tried in Ingham County, which is very different than Antrim County,"** Nessel said. "Ingham County, where Lansing is located, is a very, very Democratic-leaning county." [Craig Mauger, *Nessel: Antrim County jury 'seemingly not so concerned' about plot to kill Whitmer*, Detroit News, September 18, 2023.]

### 3. The AG'S Admissions in a Prior Federal Court Action Further Confirm That the AG Knows That No Crime Was Committed

87.     Even more remarkably, the AG knew that Plaintiff had not committed a crime long before she instituted the State Court Prosecution.  This is made clear by a number of judicial admissions the AG made in a federal court case – *King v. Whitmer*, E. D. Mich. Case No. No. 2-20-cv-13134 – arising out of another challenge to the results of the 2020 election.

88.     After the federal district court dismissed the case, the AG – who represented Governor Whitmer and Secretary of State Joscelyn Benson – sought sanctions against the lawyers who brought the case.  One of the arguments the AG advanced was that the plaintiff's lawyers had engaged in vexatious litigation in violation of 28 U.S.C. § 1927 ("Section 1927") by continuing to prosecute the lawsuit after the Democrat Electors cast their votes for President Biden and Vice President Harris on December 14, 2020.  *See* Appellees' Brief on Appeal in *King v. Whitmer*, 6th Cir. No. 22-1010, Doc. 33 (Exhibit R hereto).

89.     To support her request for Section 1927 sanctions, the AG flatly stated that, as of December 14, 2020, there was **"no process for permitting the unsuccessful elector candidates to cast their votes**." *Id.*, p. 10 (emphasis added). To support this statement, the AG relied upon a newspaper article published by MLive on December 15, 2020 titled "**Michigan Republicans who cast electoral votes for Trump have no chance of changing Electoral College result**." *Id.* at n. 11 (emphasis added).  A copy of the December 15, 2020 MLive Article is attached hereto as Exhibit D.

90.     Notably, the MLIVE Article highlighted by the AG before the Sixth Circuit prominently featured the following quote from a constitutional law expert:

> Richard Friedman, a professor at the University of Michigan and constitutional law expert, **called the attempt to cast electoral votes for Trump a political "stunt." The Republican elector votes have no legal authority**, he said.

> "There's nothing preventing any group of 16 people from getting together and saying 'we're electors,' but it doesn't have any legal force," Friedman said. "My guess is that whatever mail 16 people choose to send in will not even see the light of day. But if it does, it would not have the same standing as the certificates of the governor." [Exhibit D hereto (emphasis added)].

91.     In affirming the grant of sanctions, the 6th Circuit curtly rejected the argument that the existence of an "alternative slate of electors" justified the continuation of the lawsuit after the Democratic Electors cast their votes on December 14, 2020.  The 6th Circuit stated:

The sanctioned attorneys now argue that the case gained "new life" when "an alternative slate of electors for Michigan was advanced in early January." **That formulation is passive for a reason: what actually occurred in January is that the "alternative slate of electors" purported to elect themselves for the purpose of casting Michigan's electoral votes. And counsel do not explain why any competent attorney would take that self-election seriously for purposes of persisting in this lawsuit.** Moreover, plaintiff's refusal to dismiss their suit had concrete consequences for defendants, who were forced to research and brief motions to dismiss that they should not have needed to file. The district court was right to impose sanctions under § 1927. [*King v. Whitmer*, 71 F.4th 511, 530 (6ᵗʰ Cir. 2023) (emphasis added).]

92.     Stated simply, if no competent attorney could believe that the Republican Electors could still potentially affect the election outcome after the Democratic Electors voted on December 14, 2020, it is manifest that no reasonable **prosecutor** could conclude that the Republican Electors purported execution and submission of the Elector Certificate had even the potential to overturn the election result.  Absent that potential, there can be no crime, for all of the reasons already outlined above.

### PLAINTIFF MOVED MICHIGAN'S 54-A DISTRICT COURT TO DISMISS THE INDICTMENT AGAINST PLAINTIFF FOR FAILURE TO STATE A CLAIM, BUT THE 54-A DISTRICT COURT DENIED PLAINTIFF'S MOTION ON INCORRECT PROCEDURAL GROUNDS WITHOUT REACHING THE MOTION'S MERITS

93.     On September 14, 2023, Plaintiff filed a Motion for Summary Disposition under MCR 2.116(C)(8) in the Michigan Criminal Prosecution.  A copy of Plaintiff's motion is attached hereto as Exhibit S.

94.     In his Motion for Summary Disposition, Plaintiff explained that the 54-A District Court could apply the rules of civil procedure even though Plaintiff brought the motion in a criminal case.  *See Id.*, pp. 5-6.

95.     Relying on the same legal principles Plaintiff relies on in this Complaint, Plaintiff asked the 54-A District Court to dismiss the charges against him because, even if everything the AG alleged in its criminal complaint were true, as a matter of law Plaintiff would not have committed a crime.[6] *See generally Id.*, pp. 14-20.

96.     The AG responded to Plaintiff's Motion for Summary Disposition by simply arguing that the relevant court rule, MCR 2.116(C)(8), did not apply because the proceeding was criminal, not civil.  *See* AG's Response to Motion for Summary Disposition, Exhibit T hereto, ¶¶ 4, 8-9 ("It is the People's position that Defendant Frost has incorrectly applied a civil standard to a criminal case. . . . Summary disposition is exclusively a civil remedy that allows a party to a civil action to set forth defenses and objections in the pleadings. . . . A defendant charged with a felony is entitled to a preliminary examination whereby a judge determines the existence of probable cause.").

---

[6]     A motion for summary disposition in a criminal case is unusual because in almost all such cases, the government's complaint alleges conduct that, if it occurred in the manner the government alleges, would constitute a crime.

For example, a prosecutor might allege that A broke into B's house using a stolen key and stole B's watch.  If those facts are true, A has committed the crimes of breaking and entering and larceny.  A might defend the charges by alleging that he was residing with B at the relevant time, that B had given him a key to the house, and that the watch belonged to A.  The trial court would need to make factual determinations to find out which facts were true.

Here, it is as if the prosecutor **alleged in the indictment** that A had permission to be in the house and owned the watch, but was nevertheless guilty of breaking and entering and larceny.

97.     The AG did not address the merits of Plaintiff's motion in her response.

98.     Plaintiff filed a Reply Brief in support of his Motion for Summary Disposition (Exhibit U hereto) wherein he again explained that the Michigan Court Rules permit a criminal defendant to file a motion for summary disposition.  *Id.*, pp. 2-5.

99.     The 54-A District Court denied Plaintiff's Motion for Summary Disposition on wholly procedural grounds, without reaching the motion's merits:

> THE COURT: (Inaudible) zero basis for the defense argument. The concern that I have, A, I agree with the Office the Attorney General as it relates to when it's appropriate to apply Michigan Court Rules. I don't think we're in a situation here where it's appropriate to bring a motion for Summary Disposition. This is a criminal proceeding, it's a felony criminal proceeding, and a felony -- and the prosecution has a right to a preliminary examination, and the purpose of the preliminary examination is to require the prosecution to put forth sufficient evidence as facts, to establish if they have sufficient probable cause that a crime was committed and probable cause to charge your client with a crime. We've not done that. So to make an argument that we should do a disposition based on a summary of the proceedings would be inappropriate and it would be preemptive. It should be something that should be given or taken before the court, maybe at the circuit court level, (inaudible) at this level because we haven't had a preliminary examination. We don't even know if they have sufficient facts to determine whether or not a crime was committed. All we have is a pleading. And the allegation here is that there's several counts of a crime being committed. Count II being conspiracy to commit forgery; Count II, forgery; Count III, forgery; Count IV, conspiracy to commit uttering and publishing; Count V, uttering and publishing; Count VI, conspiracy to commit forgery election law; and then Count VII and VIII, forgery election law. We first need to have a hearing in the court, and that would be an evidentiary-based hearing for the Attorney General's Office to put forth evidence and to determine, and the court will make that determination as to whether or not there's sufficient evidence to determine whether or not there was a crime that was actually committed, and if so, if there's sufficient probable cause to charge Mr. Frost with a

crime. As you should be aware, that's a real burden, it's not a heavy burden to overcome, it's more than you have a suspicion that a crime was committed. So for these reasons, your motion for Summary Disposition will be denied. [Hearing Trans. 10/6/23, Exhibit V hereto, pp. 9-11.]

100.   Accordingly, unless this Court intervenes, Plaintiff will be forced to undergo a preliminary examination **without** any prior consideration of whether the facts the AG alleged in her criminal complaint, viewed in the light most favorable to the AG, amount to a crime as a matter of law.

101.   In other words, the 54-A District Court will force Plaintiff to endure an expensive, burdensome preliminary examination, purportedly to determine whether the AG has "sufficient facts to determine whether or not a crime was committed", when the AG **has not even alleged facts in her indictment that would, if true, constitute a crime.**

102.   Plaintiff's preliminary examination in the Michigan Criminal Prosecution is imminent, by litigation standards.  The 54-A District Court has ordered Plaintiff to appear for a probable cause conference on December 15, 2023.  *See* Notice to Appear, Exhibit W hereto.  On that date, Plaintiff expects the 54-A District Court to set his preliminary examination for a date in the near future.

103.   Plaintiff is entitled to a preliminary injunction barring the AG from conducting any proceedings in the Michigan Criminal Prosecution, including, but not limited to, a preliminary examination until this Court adjudicates Plaintiff's right to permanent injunctive relief.

104.   "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)).

105.   The Court considers four factors when deciding whether to grant a preliminary injunction: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

106.   "These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

107.   Here, Plaintiff satisfies all four factors for granting a preliminary injunction.

108.   First, for the reasons set forth in great detail above, Plaintiff has a strong likelihood of success on the merits.  As a matter of law, no crime was committed, so there can be no criminal prosecution.

109.    Second, if Plaintiff is forced to continue defending the AG's prosecution of a non-crime, Plaintiff will suffer irreparable injury in the form of financial cost and, more importantly, psychic harm and the violation of his constitutional right to be free of bad faith prosecution.  *See* citations in ¶ 121, *infra*.

110.    Third, issuing a preliminary injunction against the Michigan Criminal Prosecution will not cause substantial harm to others.  Plaintiff is not accused of a violent crime and does not otherwise present a danger to the community.  Enjoining his prosecution long enough to determine whether, as a matter of law, a crime was committed will not endanger the public, or deprive the public of its right to see justice done.

111.    Fourth, the public interest would be served by the issuance of a preliminary injunction because it is in the public interest to stop criminal proceedings when no crime has been committed.  If a citizen can be prosecuted for a non-crime and shoved through a gauntlet of state district court proceedings before any court will hear his or her arguments for dismissal, then the process itself becomes the punishment, under circumstances where no punishment can be warranted by law.  *See Netflix*, 641 F. Supp. 3d at 339-43 (finding that a preliminary injunction was warranted in light of a prosecutor's bad faith prosecution of a non-crime).

## COUNT I

### VIOLATION OF PLAINTIFF'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO BE FREE OF BAD FAITH PROSECUTION UNDER 42 U.S.C. § 1983

112.   Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

113.   The AG acted under color of law, in bad faith, and in violation of Plaintiff's Fourteenth Amendment due process rights when she brought the Michigan Criminal Prosecution.

114.   The Eleventh Amendment does not confer immunity on the AG because Plaintiff brings this action against the AG in her official capacity to enjoin a continuing violation of federal law, seeking prospective relief.

115.   The AG indicted Plaintiff in the Michigan Criminal Prosecution even though she knew she could not prove the requisite intent for the charged offenses, or that Plaintiff's conduct exposed anyone to a risk of loss.

116.   The AG has repeatedly and publicly stated that she believes Plaintiff lacked the requisite intent to defraud because Plaintiff and the other "false electors" "genuinely believe[d]" their actions were lawful.

117.   And as the AG herself argued in *King v. Whitmer*, there was "no process for permitting the unsuccessful elector candidates to cast their votes" – so Plaintiff's actions could not have exposed anyone to a risk of loss.

118.    Moreover, the AG waited to bring charges against Plaintiff until more than three years after the conduct at issue, and until after the U.S. Attorney General and the Ingham County Prosecutor had both declined to prosecute Plaintiff.

119.    Although the AG's delay in bringing charges may be circumstantial, it is evidence that her prosecution of Plaintiff is political and was brought in bad faith.

120.    Similarly, the AG's public statements regarding Ingham County jurors' "Democratic leaning[s]" and their supposed relative willingness to convict Plaintiff further demonstrate that her prosecution of Plaintiff was based on politics, not the interests of justice, and was thus done in bad faith.

121.    If this Court does not enjoin the AG's prosecution of Plaintiff in the Michigan Criminal Prosecution, Plaintiff will be forced to undergo a preliminary examination when he does not face any charges upon which the AG could convict him, as a matter of law.  Plaintiff will thereby suffer irreparable harm.  *See Hand*, 838 F.2d at 1424 (holding that state prosecutors' violations of the constitutional right to be free of bad faith prosecution "cause sufficient irreparable harm to support federal injunction of a state prosecution") (citing *Dombrowski v. Pfister*, 380 U.S. 479, 490; 85 S. Ct. 1116, 1122 (1965); *Shaw v. Garrison*, 467 F.2d 113 n. 11 (5th Cir.), *cert. denied*, 409 U.S. 1024; 93 S. Ct. 467 (1972) ("When the federal right sought to be protected is the right not to be subjected to a bad faith prosecution or a prosecution brought for purposes of harassment, the right cannot be vindicated by undergoing the prosecution."); *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971)).

122.    As discussed in detail above at ¶¶ 52-56, *Younger* abstention does not apply and a federal court may enjoin a state criminal prosecution where (1) "the state-court proceeding was brought in bad faith or to harass the federal plaintiff" or (2) "where other 'extraordinary circumstances' threaten 'irreparable loss [that] is both great and immediate.'" *Gates v. Strain*, 885 F.3d 874, 880 (5th Cir. 2018) (quoting *Younger*, 401 U.S. at 45).

123.    Again, the AG brought the Michigan Criminal Prosecution in bad faith because (a) she admits she cannot prove Plaintiff acted with the requisite criminal intent; (b) the allegations stated in the criminal complaint and Shock's supporting affidavit do not amount to allegations of criminal conduct; and (c) the AG admittedly brought the prosecution for a political purpose in a jurisdiction where she believes the jurors will be politically reliable.

124.    Moreover, the Michigan Criminal Prosecution presents extraordinary circumstances because the AG has accused Plaintiff of a crime in charging documents that do not actually describe the commission of a crime.

125.    In almost all criminal prosecutions, the government's complaint alleges conduct that, if it occurred in the manner the government alleges, would constitute a crime.

126.    If Plaintiff is forced to undergo a preliminary examination under these extraordinary circumstances, he will suffer irreparable loss that is both great and

immediate – specifically, the Kafkaesque psychic cost of enduring a criminal proceeding as an innocent person when no actual crime has been alleged.

127.   Plaintiff therefore seeks  preliminary and permanent injunctions against the AG enjoining her from pursuing the Michigan Criminal Prosecution.

### CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment in favor of Plaintiff and against the AG granting the following relief:

1. Preliminary and permanent injunctive relief against the AG enjoining the AG pursuing any pending indictment or criminal charges against Plaintiff or seeking to reindict Plaintiff for any charge arising from or related to the conduct alleged in the Michigan Criminal Prosecution;

2. Costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988; and

3. Any other relief, in law or in equity, to which Plaintiff may be entitled.

KICKHAM HANLEY PLLC

By: */s/ Gregory D. Hanley*
Gregory D. Hanley (P51204)
Edward F. Kickham Jr. (P70332)
Counsel for Plaintiff
32121 Woodward Ave, Suite 300
Royal Oak, Michigan 48073
(248) 544-1500
ghanley@kickhamhanley.com
ekickhamjr@kickhamhanley.com

KDK LAW

By: */s/ Kevin Kijewski*
Kevin Kijewski (P74153)
950 East Maple Road, Suite 204
Birmingham, MI  48009
(248) 971-01476
Co-Counsel for Plaintiff
kevin@kdklawoffice.com

Dated: November 21, 2023