UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLIFFORD FROST, JR.

    Plaintiff,

v.

DANA NESSEL

    Defendant.

_____/

Case No. 1:23-cv-1226

HON. ROBERT J. JONKER

# ORDER

## INTRODUCTION

The matter is before the Court on Plaintiff Clifford Frost, Jr.'s November 30, 2023 Motion for Preliminary And/Or Permanent Injunction. (ECF No. 5). On July 18, 2023, Defendant Dana Nessel—Michigan's Attorney General—charged Frost in state criminal court with eight felonies for his alleged actions as a Republican-nominated presidential elector in the aftermath of the 2020 presidential election ("the state prosecution"). (ECF No. 1-4 at PageID.81–82). Several months later, on November 21, 2023, Frost filed this 42 U.S.C. § 1983 action against Nessel. (ECF No. 1). Frost seeks to enjoin the Attorney General's "bad faith prosecution" on the basis that the "allegations against him in the Criminal Complaint do not amount to a crime." (ECF No. 5). For the following reasons, the Court **ABSTAINS** from exercising jurisdiction under the doctrine articulated in *Younger v. Harris*, 401 U.S. 37 (1971), and **DISMISSES** Frost's action.[1]

---

[1] The Court reaches this conclusion whether it treats Frost's motion as a request for preliminary injunctive relief, permanent injunctive relief, or both.

## I.  BACKGROUND

In August 2020, Michigan's Republican Party selected Plaintiff Clifford Frost, Jr. as a presidential elector for the Republican presidential nominee in the 2020 presidential election in Michigan.  *See* U.S. CONST. art. II, § 1; MICH. COMP. LAWS § 168.42.  (*See, e.g.*, ECF No. 1-3 at PageID.68–70).  On November 23, 2020—several weeks after the general election on November 3—Governor Gretchen Whitmer certified that the Democratic presidential and vice presidential nominees won the most votes and that the Democratic-nominated electors "were duly elected as Electors of the President and Vice President of the United States of America" for the State of Michigan.  *See* MICH. COMP. LAWS § 168.45–46.  (*Id.* at PageID.70).  Litigation ensued, and on December 14, 2020, Frost and other Republican-nominated presidential electors appeared at the State Capitol in Lansing and asserted their right to cast ballots as electors of the president and vice president.  *See* MICH. COMP. LAWS § 168.47.  (*Id.* at PageID.71–72).

After the Michigan State Police refused to admit the Republican-nominated electors into the State Capitol, the 16 electors met at the nearby headquarters of the Michigan Republican Party. In a document asserting themselves as "the duly elected and qualified Electors for President and Vice President of the United States of America from the State of Michigan," the group proceeded to sign an "alternative slate" of presidential ballots in favor of the Republican presidential nominee ("the Alternative Certificate").  (*Id.* at PageID.72; ECF No. 1-2 at PageID.55).  The Republican-nominated electors then submitted this Alternative Certificate to the National Archives in advance of Congress' joint session on January 6, 2021 to count the electoral votes.  *See, e.g.*, U.S. CONST. amend. XII; 3 U.S.C. §§ 5–6, 15.  (ECF No. 1-3 at PageID.73).

Because Governor Whitmer certified that the Democratic nominee won Michigan's 2020 presidential election, Congress ultimately only counted the presidential ballots from the

Democratic-nominated electors when they tallied the electoral votes on January 6. *See, e.g.*, 3 U.S.C. §§ 5–6, 15. (ECF No. 1-12 at PageID.129). Even though Congress did not count the Alternative Certificate, the State of Michigan charged each of the Republican-nominated presidential electors—including Frost—with eight felonies for their actions. (ECF No. 1-4 at PageID.81–82). Frost is charged with one count of conspiracy to commit forgery, MICH. COMP. LAWS §§ 750.157a, 750.248; two counts of forgery, MICH. COMP. LAWS § 750.248; one count of conspiracy to commit uttering and publishing, MICH. COMP. LAWS §§ 750.157a, 750.249; one count of uttering and publishing, MICH. COMP. LAWS § 750.249; one count of conspiracy to commit election law forgery, MICH. COMP. LAWS §§ 750.157a, 168.933a; and two counts of election law forgery, MICH. COMP. LAWS § 168.933a. (*Id.*)

On November 21, 2023, Frost filed this lawsuit against Defendant Nessel under 42 U.S.C. § 1983 to enjoin the state prosecution against him. (ECF Nos. 1, 5). Frost's preliminary examination is currently scheduled for January 30, 2024, and he contends that "[i]f [he] is forced to undergo a preliminary examination under these extraordinary circumstances, he will suffer irreparable loss that is both great and immediate—specifically, the Kafkaesque psychic cost of enduring a criminal proceeding as an innocent person when no actual crime has been alleged." (ECF No. 5 at PageID.390). In its response, Nessel argues that under the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971), this Court should decline to intervene in the state prosecution. (*See, e.g.*, ECF No. 12 at PageID.434–40). The Court agrees that *Younger* abstention is appropriate here.

## II. ANALYSIS

### A. The *Younger* Abstention Landscape.

Federal courts typically have a "virtually unflagging obligation" to decide cases within their jurisdiction. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). In *Younger v. Harris*, however, the Supreme Court articulated a "far-from-novel" exception to this general rule for pending state criminal prosecutions. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 364 (1989) (citing 401 U.S. at 43–44). In *Younger*, the plaintiff sought to enjoin a state prosecution against him under the California Criminal Syndicalism Act on the grounds that it violated his First Amendment free speech rights. 401 U.S. at 38–39. The Supreme Court explained "that concepts of comity and federalism require federal courts to abstain from interfering with pending state court criminal proceedings, except under 'special circumstances' such as a bad-faith prosecution or when a criminal statute is 'flagrantly and patently' unconstitutional on its face." *Wassef v. Tibben*, 68 F.4th 1083, 1086–87 (8th Cir. 2023) (quoting *Younger*, 401 U.S. at 41, 44–45). Because no "special circumstances" applied to the plaintiff's case, the Supreme Court declined to intervene in the state prosecution. 401 U.S. at 54.

In the decades since the *Younger* decision, the Sixth Circuit—with guidance from the Supreme Court—has developed a three-step analysis for determining whether *Younger* abstention is appropriate in a particular federal proceeding. First, to qualify for *Younger* abstention, the state proceeding at issue must be an "ongoing state criminal prosecution," a civil enforcement proceeding "akin to a criminal prosecution," or a "civil proceeding[] involving certain orders [i.e., contempt orders] that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *See, e.g., Doe v. Univ. of Kentucky*, 860 F.3d 365, 369 (6th Cir. 2017) (citing *NOPSI*, 491 U.S. at 368). Next, if the proceeding fits into one of these *NOPSI* categories, the Court must apply the three-factor test from *Middlesex County Ethics Committee v. Garden State Bar Ass'n*.

*Doe*, 860 F.3d at 369 (citing 457 U.S. 423, 432–34 (1982)). Under *Middlesex*, abstention is appropriate only if the state proceeding is pending; involves an important state interest; and provides the federal plaintiff with an adequate opportunity to raise constitutional challenges in a competent forum. 457 U.S. at 432–34, 437. Third, even if abstention is otherwise warranted under *NOPSI* and *Middlesex*, "a plaintiff still has the opportunity to show that an exception to *Younger* applies. These exceptions include bad faith, harassment, or flagrant unconstitutionality of the statute or rule at issue." *Doe*, 860 F.3d at 371 (citing *Younger*, 401 U.S. at 53–54).

### B. *NOPSI* Category 1 and the *Middlesex* Factors.

Frost does not dispute that the ongoing state criminal prosecution against him satisfies *NOPSI* Category 1. The Court further agrees with Frost's apparent concession that the state criminal proceedings satisfy the three *Middlesex* factors. To start, the state criminal prosecution is undoubtably pending. Frost seeks an injunction *precisely* to avoid his upcoming preliminary examination on January 30, 2024. The state prosecution against Frost also serves an important state purpose—specifically, Michigan's right to enforce its criminal laws. "Under our federal system, it goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government." *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981) (cleaned up). *Younger* itself dealt with a challenge to an ongoing state criminal prosecution, and "[p]ending state criminal proceedings have always been viewed as paradigm cases involving paramount state interests." *Juidice v. Vail*, 430 U.S. 327, 345 (1977) (Brennan, J., dissenting).

As for the third *Middlesex* factor, the state prosecution provides Frost with adequate opportunities to raise constitutional challenges and any other challenges in a competent forum. Frost's only argument remotely related to this last *Middlesex* factor is that the state prosecution

violates the Fourteenth Amendment because the allegations against him do not amount to a crime. Frost, however, is free to assert this sufficiency-of-the-evidence claim in the state criminal proceedings—starting at his impending preliminary examination. In fact, "[t]he [very] purpose of a preliminary examination is to determine whether a crime was committed and whether there is probable cause to believe that the defendant committed it." *People v. Taylor*, 890 N.W.2d 891, 894 (Mich. App. 2016).

At his preliminary examination, Frost can test the government's case against him by cross-examining the government's witnesses and by calling his own witnesses (including himself) and presenting evidence. *See, e.g.*, MICH. COMP. LAWS § 766.1; MICH. CT. R. 6.110. If Frost is bound over for further proceedings, he can continue to challenge the state prosecution by moving to quash the bind-over order, and then—if necessary—by taking the case to trial. "[The] pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims, and [Michigan] law appears to raise no procedural barriers." *See Moore v. Sims*, 442 U.S. 415, 430 (1979). Indeed, the state criminal proceedings provide Frost with *multiple* "full and fair" opportunities to raise any constitutional issues to his prosecution. *See, e.g.*, *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 627 (1986). This is all *Younger* abstention requires. *See Juidice*, 430 U.S. at 337.

The Michigan state criminal courts are also competent to decide any potential constitutional challenges Frost raises regarding his prosecution. Only decisionmakers infected by personal or pecuniary bias have failed this competency standard, and there is no evidence in the record suggesting that either type of bias exists here. *See, e.g.*, *Gibson v. Berryhill*, 411 U.S. 564, 578–79 (1973). Even though Frost contends that the state criminal prosecution is politically motivated, he does *not* allege that the Michigan state court charged with overseeing his case is

biased in any way. Moreover, to the extent that Frost is concerned that the state court might resolve potential constitutional issues differently than this Court, "a state judicial system is not an unfair forum simply because its ruling on an issue of federal law differs from ours." *See Formosa v. Lee*, No. 23-5296, 2024 WL 113788, at *3 (6th Cir. Jan. 10, 2024). State courts have an equal responsibility with the federal courts to safeguard constitutional rights, and the notions of federalism and comity underpinning *Younger* preclude any presumption that the state courts will not do so. *See Middlesex*, 457 U.S. at 431. Besides, Frost is also free to elect to proceed to a jury trial, thereby empowering a jury—rather than a state court judge—with the ultimate decision-making authority in this case. Accordingly, the Court concludes that the three *Middlesex* factors support abstention.

### C. **Exceptions to *Younger* Abstention.**

Notwithstanding *NOPSI* and the *Middlesex* factors, Frost argues that *Younger* abstention is inappropriate here because the "bad faith prosecution" exception applies. Frost contends that Nessel initiated the state prosecution against him in bad faith because "the factual allegations of forgery which form the basis for all the counts in the Michigan Criminal Prosecution, even if true, as a matter of law do not constitute a crime." (ECF No. 5 at PageID.352). He maintains that Governor Whitmer's prior certification of the Democratic nominee as the winner of the 2020 presidential election made the Alternative Certificate a "legal nullity" and therefore did not expose anyone to loss—a required element of forgery. (*Id.* at PageID.353). Additionally, Frost asserts that the Alternative Certificate is "not a lie" because it is "exactly what it purports to be: it accurately identifies the persons *purporting to be* the 'duly elected and qualified Electors for President and Vice-President of the United States of America from the State of Michigan.'" (*Id.*

at PageID.369 (emphasis in original)).  To bolster his argument, Frost cites public statements by Nessel suggesting that Frost and the other Republican-nominated electors were "brainwashed" and "genuinely believe[d]" that their actions were lawful.  (*Id.* at PageID.379–80).  In Frost's view, these legal weaknesses in the government's case show that Nessel "brought [the state prosecution] without a reasonable expectation of obtaining a valid conviction and therefore satisfies the bad faith requirements."  (*Id.* at PageID.354).

Frost has certainly raised multiple issues that a court will have to address and resolve on the merits.  But this is by no means enough to establish the bad faith prosecution exception to *Younger* abstention.  Frost's version of the exception would swallow the rule and effectively extend it every instance in which a defendant has a good faith argument that his alleged actions do not satisfy the elements in the charging statute.  Expanding the bad faith prosecution exception in this way would eviscerate this country's longstanding "fundamental policy against federal interference with state criminal prosecutions."  *See Younger*, 401 U.S. at 46.  Frost's view of the exception would potentially federalize state preliminary examination procedures—the exact result *Younger* abstention is designed to prevent.

The history of the bad faith exception demonstrates that it is extremely narrow.  To apply, "the threat to [Frost's] federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution."  *Younger*, 401 U.S. at 46.  As already noted, Frost has multiple opportunities in the state proceedings to present and prevail on his theories.  This strongly militates against applying the bad faith prosecution exception here.  Indeed, "the Supreme Court has applied the bad faith/harassment exception to 'only one specific set of facts: where state officials initiate repeated prosecutions to harass an individual or deter his conduct, and where the officials have no intention of following through on these prosecutions."  *Lloyd v. Doherty*, No. 18-

3552, 2018 WL 6584288, at *4 (6th Cir. Nov. 27, 2018) (quoting *Ken-N.K., Inc. v. Vernon Township*, 18 F. App'x 319, 324 n.2 (6th Cir. 2001)).

In that "one specific set of facts"—the facts in the case *Dombrowski v. Pfister*—Louisiana state and local authorities arrested the plaintiffs, who were working to vindicate the constitutional rights of Black citizens in the 1960s South. 380 U.S. 479, 482 (1965). The authorities contended that the plaintiffs violated the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law and raided their offices. *Id.* at 482, 487–88 & n.4. A state judge suppressed the evidence obtained during the raid and dismissed the charges against the plaintiffs, but the authorities continued to harass the plaintiffs by publicly asserting that the plaintiffs' civil rights organization operated as a front for the Communist party. *Id.* at 488–89. They also repeatedly threatened the plaintiffs with future prosecutions and eventually obtained new indictments against the plaintiffs under the two Acts. *Id.*

The plaintiffs sued to enjoin this pending prosecution, and the Supreme Court agreed that the government's actions justified a narrow exception to federal courts' general policy against interfering with ongoing state criminal proceedings. *Dombrowski*, 380 U.S. at 497–98. Citing the Louisiana state and local authorities' relentless and repeated abuse of the legal system to threaten, harass, and arrest the plaintiffs, the Supreme Court explained that plaintiffs faced an extraordinary situation "in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights." *Id.* at 485. It was within this singular context that the Supreme Court expounded that prosecutions "not made with any expectation of securing convictions" qualify for the bad faith prosecution exception to *Younger* abstention. 401 U.S. at 48 (quotation omitted).

Viewing the bad faith prosecution exception through the lens of *Dombroski*—as the Court must—Nessel plainly did not bring the state prosecution "without a reasonable expectation of

obtaining a valid conviction." Critically, unlike the plaintiffs in *Dombrowski*, Frost has not been subject to multiple prosecutions or threats of prosecution. The Michigan state prosecution is the *only* criminal proceeding against Frost related to his actions as a Republican-nominated elector in the aftermath of the 2020 election. Nor is there any evidence to suggest that the charges against Frost have no basis in fact or law like the Communism charges at issue in *Dombrowski*. Frost's argument that the prosecution cannot prove its case against him or has failed to state an actionable claim is akin to the claims by almost every defendant contesting liability in any criminal case. There is nothing remotely unique or exceptional about Frost's arguments that would require this Court to intervene in his state criminal prosecution but at the same time provide a limiting principle to avoid having to do so in virtually every other state criminal case.

As a final point, the Court notes that Frost's reliance on *Netflix, Inc. v. Babin* is misplaced. 641 F. Supp. 3d 319 (E.D. Tex. 2022), *aff'd,* 88 F.4th 1080 (5th Cir. 2023). To start, *Babin* does not bind this Court. More importantly, unlike this case, *Babin* involved repeated meritless and retaliatory prosecutions like those in *Dombrowski*. *Id.* at 326–27. In *Babin*, the District Attorney for Tyler County ("the DA") sought and received a grand jury indictment against Netflix for the "promotion of lewd visual material depicting child" in its film *Cuties*. *Id.* at 327. When Netflix moved to dismiss the state prosecution on First Amendment grounds, the DA agreed, but then immediately issued four new child pornography indictments against Netflix for intentionally and knowingly promoting a performance that included sexual conduct by a minor. *Id.* Each of the new indictments corresponded to a different actress in *Cuties*, including an actress who the DA knew was over the age of 18 when *Cuties* was filmed. *Id.* at 336–37. Taken together, the district court concluded that these suspicious circumstances indicated that "at least one of the New

Indictments were brought without any hope of obtaining a valid conviction" and that the bad faith prosecution exception applied. *Id.* at 337–38.

This is not a pathbreaking holding. To the contrary, the district court's emphasis on the DA's repeated prosecutions of Netflix is entirely consistent with *Younger*'s admonition that the bad faith prosecution exception should be cabined to extreme cases resembling *Dombroski*. Because no such circumstances exist here, the bad faith exception to *Younger* abstention does not apply, and the Court must abstain from intervening in the state prosecution against Frost.

**ACCORDINGLY, IT IS ORDERED**:

1. The Court will **ABSTAIN** from exercising jurisdiction under the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971).

2. This matter is **DISMISSED**. *See, e.g.*, *Watts v. Burkhart*, 854 F.2d 839, 844 (6th Cir. 1988) ("*Younger* established the principle that in cases seeking to enjoin ongoing state criminal proceedings, federal courts should not exercise jurisdiction but instead should dismiss the cases in their entirety." (citing *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973))).

**IT IS SO ORDERED.**

Dated: January 18, 2024                   /s/ Robert J. Jonker
                                          ROBERT J. JONKER
                                          UNITED STATES DISTRICT JUDGE